(28 Misc. Rep. 145.)

## PERKINS v. ALLEN.

(Supreme Court, Appellate Term.    June 28, 1899.)

1. LANDLORD AND TENANT—REPAIRS.

The lessee of a house agreed to make all internal repairs, and had been given to understand by the lessor that the terms of the agreement were to be enforced.   Repairs in the plumbing being necessary, the lessee ordered a plumber to do the work, and afterwards sought to get the lessor's consent to have it done at her expense, but only succeeded in getting ambiguous expressions, which were rather in the way of consent to the work being done than of authority to do it at lessor's expense.   Later the lessor declined to pay the bill, and lessee acquiesced, by remaining in the house some months longer.   *Held,* in an action for rent, that the evidence was not sufficient to support a claim that lessee was authorized to make the repairs at lessor's expense, and offset the cost against the rent.   Per MacLean, J., dissenting.

2. SAME—SURRENDER OF PREMISES AS UNTENANTABLE.

Under Laws 1896, c. 547, § 197, permitting a tenant to surrender premises when, without his fault, they become untenantable, where it does not appear that certain defects in the plumbing have arisen without lessee's neglect, and where the defects do not appear to have been productive of illness or any serious inconvenience, a surrender will not be warranted. Per MacLean, J., dissenting.

Appeal from municipal court, borough of Manhattan, Seventh district.

Dissenting opinion.    For majority opinion see 58 N. Y. Supp. 1080.

Argued before FREEDMAN, P. J., and MacLEAN and LEVEN-TRITT, JJ.

Baldwin & Blackmar, for appellant.

Oppenheim & Severance, for respondent.

MacLEAN, J. (dissenting).    In a lease under seal, executed May 28, 1896, whereby the plaintiff demised to the defendant, for the term of three years from October 1, 1896, certain premises as a dwelling house in the city of New York, was this clause:

"It is understood and agreed between the parties to these presents that the party of the first part will allow the party of the second part the sum of $———— for interior repairs to said premises during the term of this lease, which amount the party of the second part has the option of deducting from the first year's rent, and that the said party of the second part will do all interior repairs to the premises at his own cost and expense, and that the party of the first part will do all exterior repairs during the term of this lease."

The defendant paid the rental, as covenanted, for the three months of 1896, all of 1897, and the first six months of 1898.    This action was brought to recover the rental of July, August, and September, 1898.   In an answer, verified by one of his attorneys, the defendant denied that he had failed to pay the rent for the months mentioned, and alleged that he had tendered it for the month of July, and refused to pay for the other two months for reasons stated afterwards by way of counterclaim.    By way of counterclaim, the defendant set out discursively the hiring and letting; that the plaintiff represented that the plumbing was in perfect condition and healthy, but that the contrary was the fact, as was well known to the plaintiff;

that the plumbing was improperly and negligently constructed; that it was unsafe for any one to occupy the premises, and that during the defendant's occupancy, by reason thereof, noxious odors and gases escaped and filled the house, so that the defendant and his family were made sick, called a physician, and removed from the premises, which were untenantable; that the defendant was compelled to pay physicians' bills, lost the use of the premises, was unable to attend to his business, and damaged in a large sum; and that, at the request of the plaintiff, a plumber was employed to take out, overhaul, replace, and thoroughly put in order the plumbing, at an expense which was paid by the defendant, at the request of the plaintiff. All of the claims for deceit were abandoned during the trial, after a volume of evidence had been covered into the case thereunder.

The only issue contested was whether the defendant might recoup, against the rental claimed, and concededly due, the amount paid to the plumber. As recounted by him, in answer to his counsel, after he had occupied the house four months and a half, on February 16, 1897, the defendant had a "smoke test" of the plumbing, because, as he said, his family was ill, and usually very much used up in the morning, and he personally was unable to eat breakfast, was sick, and had a headache, which was the first intimation he had that the plumbing was not in a perfect sanitary condition. He and his family went away on the advice of a doctor. The result of the "test" he reported (what he reported he nowhere told) to the lessor, and stated that the house must be put in a perfect condition. She stated she wished her own plumber to make an examination, and guarantied he would put the plumbing in condition. The defendant replied he would not consent to his doing the work, if he continued to live in the house, as he had taken his word and test once as to the condition, and it proved to be totally different. She asked if defendant had a plumber whom he could trust, asked for his price, and when it was submitted—

"She considered it too high and exorbitant. Her own plumber would do the work for much less. I said I would guaranty Mr. Tucker would not charge any more for the work than any good plumber would, and put the work in perfect condition. Q. What else was said? A. She said she wished me satisfied. Q. What else? A. And to go on with the work. Q. What else? A. That is all. Q. What did she say? A. * * * Mrs. Perkins told me to go ahead with the work on the basis of the figures I had submitted. Q. You engaged Mr. Tucker to do this work? A. I employed Mr. Tucker. Q. He entered into possession of the premises? A. Yes, sir. Q. You had moved away with your family? A. Yes, sir; that is right. Q. The premises were given up to him? A. Yes, sir."

This evidence showed, perhaps, that the plaintiff acquiesced in the doing of the work which the defendant wanted to have done, and for which, under the lease, he was under obligation to pay; but it hardly warranted the finding of a new contract, changing the liabilities of the parties as set forth in the sealed instrument. When the defendant got his plumber's bill, it was nearly twice as big as his plumber's estimate. He sent it to the lessor. She refused to pay it. Upon his cross-examination it was developed, from his an-

swers and the correspondence, that the defendant had himself directed the plumber to go ahead with the work before he had had the alleged conversation with the lessor; that, instead of one, he had had several, conversations with her, into none of which he could put the alleged words, or substantially the alleged words, of authorization; that he sent her his plumber's bill in a long letter, which contained no intimation of misrepresentation by the plaintiff, or that she had authorized the doing of the work, but:

"I do not consider that this work, which was necessary to be done in order to put your house in livable condition, should cost me a cent, and I therefore turn the bill over to you."

The plaintiff replied, also in writing, that she was very much surprised to receive the letter; that he had ordered the work done to suit his own convenience; that she had done all, and more than all, the lease called for on her part; and that she declined to assume the payment of any repairs ordered by himself, or allow him to deduct the amount from the rent. In this the defendant acquiesced in a very practical manner, paying his rent month by month, until the 1st day of July, 1898. It was also developed on his cross-examination that this was not the first bill he had asked the plaintiff to pay; that he had seen the house before taking the lease, and that, upon moving in, on the 1st of October, 1896, he had employed the plumber, who was familiar with the premises, to make a "peppermint test"; that he had not paid this bill, but had asked the plumber to present it to the plaintiff, to whom, also, about the same time, he wrote, requesting some outside repairs and a bigger boiler; and that he had received from the plaintiff a letter, in which she said:

"As you observe, I am, by the terms of the lease, responsible for exterior repairs, and I expect to have proper precautions observed to prevent such repairs becoming necessary. The charges on the bill were for work ordered by you, and I decline to pay any bills for any work done, or to be done, in the interior of the house during the term of your lease [with due underlining of "any"]. Any difficulties that may have arisen from the plumbing are certainly for you to repair."

Thus advertised that the plaintiff expected to hold and be held to the terms of their agreement, the defendant might not undertake expenditures, and cast them upon the lessor, without distinct authorization, which may not be inferred from incidental and ambiguous expressions,—expressions rather of consent to his doing what he might do under the lease than of employment as her agent.

It was contended for the defendant that a consideration was furnished for a professed change in their contractual relations, because the house was brought within the exception to the rigid rule of the common law introduced by the act of 1860 (Laws 1860, c. 345; Laws 1896, c. 547). This failed. It was not shown that the alleged defects had arisen without the defendant's fault or neglect, nor that they were such as to render the premises untenantable and unfit for occupancy. The physician was not called. No one testified that the illness of the family was due to, or connected with, the plumbing. The only illness described was that told of, as above, by the defendant himself, whose morning symptoms, common enough, and, however recurrent, more frequently follow other incidents than

plumbing. The plumber found that the soil pipe under the cellar was earthen, after the fashion of a generation ago; that part of it was broken; that calking had fallen from it; that the smoke left a stain on parts of the ascending soil pipe; that a basin had been broken; that the leader pipe from the bay window had rusted off, where it connected with the soil pipe; and that water stood under the cellar floor. But there was no evidence of odors or gases therefrom, or of lack of vent for any exhalations to escape from below the cellar, without passing into the house. Repair of these defects, when learned, was highly advisable. To charge the plaintiff with the expense thereof, it was necessary to show that she was liable therefor. It needed no expert testimony, however, to show that these defects called only for repairs, and in no way justified the substitution of new material, a change of the system, and the adoption of devices now required by the authorities in new buildings, but which were known in relatively few houses when any one now arrived at man's estate was born. The defendant failed to sustain his counterclaim. For the allowance of the greater part of it, the judgment should be reversed, with costs.

Judgment reversed, and a new trial ordered, with costs to the appellant to abide the event.